NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

JESSE S., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, J.S., PASCUA YAQUI TRIBE,
*Appellee.*

No. 1 CA-JV 20-0268
FILED 1-14-2021

Appeal from the Superior Court in Maricopa County
No.  JD528910
The Honorable Cassie Bray Woo, Judge

**AFFIRMED**

COUNSEL

Denise L. Carroll Esq., Scottsdale
By Denise Lynn Carroll
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Doriane F. Neaverth
*Counsel for Appellee Department of Child Safety*

Pascua Yaqui Tribe, Guadalupe
By Tara M. Hubbard
*Counsel for Appellee Pascua Yaqui Tribe*

_____

## MEMORANDUM DECISION

Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge Maria Elena Cruz joined.

_____

**H O W E**, Judge:

**¶1**        Jesse S. ("Father") appeals the juvenile court's best interest finding in terminating his parental rights to his child, J.S. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

**¶2**        We view the facts in the light most favorable to sustaining the juvenile court's order. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 2 ¶ 2 (2016). J.S. is an Indian child under the Indian Child Welfare Act ("ICWA") and is enrolled in the Pascua Yaqui Tribe. She was born prematurely at 28 weeks, had amphetamines in her system, and required extended hospitalization after birth. J.S.'s mother was homeless and tested positive for methamphetamine and amphetamine. Eight hours after her birth, police arrested Father for theft and drug possession. Father was eventually convicted and sentenced to concurrent terms of 3.5 years and 2.5 years in prison and has been incarcerated all of J.S.'s life.

**¶3**        The Department of Child Safety took custody of newborn J.S.; placed her with her maternal great-aunt, an employee of the Tribe and an ICWA-compliant placement; and petitioned for dependency. The Tribe subsequently intervened. The juvenile court found J.S. dependent in March 2019.

**¶4**        J.S.'s great-aunt met all of J.S.'s medical, emotional, and physical needs; stayed involved with the Tribe's cultural events; and remained connected to the Tribe. After J.S. had been with her great-aunt for almost a year, the Department changed its case plan to severance and adoption with a concurrent case plan of guardianship and moved to terminate Father's parental rights on the length-of-sentence ground. While the Tribe recognized that Father had failed to be present for J.S.'s formative years and had not tried to reunify with her, the Tribe argued that

termination was not in her best interests because it was contrary to tribal policy and petitioned that the great-aunt be made a permanent guardian.

**¶5**        In August 2020, the juvenile court held a combined hearing on the Department's termination motion and the Tribe's guardianship motion. The Department's case manager testified that termination was appropriate because Father had been unable to maintain a normal parent-child relationship and would not begin to show whether he could have a relationship with J.S. until July of 2021. The case manager also testified that termination served J.S.'s best interest because it allowed her great-aunt to adopt her, providing the permanency a child in her tender years needs.

**¶6**        The case manager testified that the Department pursues guardianship only when adoption is remote or severing the parent-child relationship would not serve the child's best interests. Because guardianships are revocable, a guardianship would allow one of J.S.'s parents to begin revocation procedures, perhaps even many years down the road, which would uproot any permanency J.S. may have enjoyed. Lastly, the case manager testified that placement with the great-aunt was the least restrictive alternative because she met J.S.'s needs and kept J.S. connected to the Tribe and its customs and traditions.

**¶7**        The great-aunt testified that she was willing to adopt J.S. and that she preferred adoption over a permanent guardianship because it would benefit J.S. more. She too expressed grave concern that Mother or Father might attempt to regain custody of J.S. "years from now," which could traumatize J.S. She further testified that regardless whether she adopted J.S. or became her permanent guardian, she would facilitate visits between J.S.'s siblings and allow contact between J.S. and her biological parents. The Department's qualified ICWA expert opined that adoption was in J.S.'s best interests because she was only two years old and either parent could contest the guardianship, requiring the court to subsequently reassess a permanent plan for J.S., which could cause her upheaval and trauma.

**¶8**        The Tribe's expert indicated the Tribe's preferences were "reunification first, guardianship second, and then termination only when absolutely necessary." The Tribe's expert testified that termination is only "absolutely necessary" when parents have abandoned the child. The intent of the Tribe's policy is that the "Department shall seek to maintain and support the child's relationship to his or her biological parents, extended family members, the child's tribe, and other individuals with whom the child has an attachment." The expert further testified that the termination

was not in J.S.'s best interest and that once Father was released from incarceration in July 2021, he could be given the opportunity to participate in services.

**¶9**        The juvenile court found by clear and convincing evidence grounds to terminate Father's parental rights under A.R.S. § 8–533(B)(4), stating that Father's felony incarceration would deprive J.S. of a normal home life for a period of years. The court found that the great-aunt was meeting J.S.'s needs and was willing and able to adopt J.S. It found that the great-aunt provided J.S. "with a loving and nurturing home environment and the child has been thriving in her care." It further found that

> [m]aternal great aunt testified and expressed willingness to maintain the Child's familial connections, including with siblings to whom Mother previously had her parental rights terminated. [. . .] Maternal great aunt specifically expressed a preference for adoption over guardianship."

**¶10**        In considering permanency as part of its best interests analysis, the court found that it had received conflicting testimony whether guardianship would be detrimental to J.S. because the parents could seek to regain custody of J.S. after she had spent her formative years with her maternal great-aunt. The juvenile court concluded that in this instance "permanency cannot be established through Guardianship, because a Guardianship is subject to possible revocation." It therefore concluded that "[t]ermination of the parent-child relationship will provide the child with necessary permanency in the adoptive home," that "termination will still provide the Child with a home that maintains her ties to the Pascua Yaqui culture and traditions," and that termination of parental rights was J.S.'s best interests.

**¶11**        Because the court found that termination was in J.S. best interests, it found that the Tribe had failed to establish beyond a reasonable doubt grounds for permanent guardianship. Father timely appeals.

## DISCUSSION

**¶12**        Father argues the court erred in denying the petition of guardianship and terminating his parental rights to J.S. We review a juvenile court's termination order for an abuse of discretion. *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 58 ¶ 9 (App. 2015). "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280

¶ 4 (App. 2002). We accept the juvenile court's factual findings unless no reasonable evidence supports them and will affirm a termination order unless the order is clearly erroneous. *Bobby G. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 506, 508 ¶ 1 (App. 2008).

**¶13** Terminating parental rights is in the child's best interests if the child will benefit from the termination or will be harmed if the relationship continues. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150 ¶ 13 (2018); *see also Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179 ¶ 20 (App. 2014). Relevant factors in this determination include whether the current placement is meeting the child's needs, an adoption plan is in place, and the child is adoptable. *Demetrius L.*, 239 Ariz. at 3–4 ¶ 12. Moreover, "[i]n a best interests inquiry . . . we can presume that the interests of the parent and child diverge because the court has already found the existence of one of the statutory grounds for termination by clear and convincing evidence," *Kent K. v. Bobby M.*, 210 Ariz. 279, 286 ¶ 35 (2005), and we must not "subordinate the interests of the child to those of the parent once a determination of unfitness has been made," *Alma S.*, 245 Ariz. at 151 ¶ 15.

**¶14** Conversely, as an ICWA case, permanent guardianship may be established if the court finds, beyond a reasonable doubt, that 1) the child has been adjudicated dependent; 2) the child has been living in in the guardian's care for at least nine months; 3) the Department has made reasonable efforts to reunite the parent and the child, and further efforts would be unproductive; and 4) the likelihood that the child would be adopted is remote or termination of parental rights would not be in the child's best interests. A.R.S. § 8-871(A).

**¶15** Reasonable evidence supports the juvenile court's conclusion that the Department proved by a preponderance of the evidence that termination is in J.S.'s best interest and that the Tribe failed to prove beyond a reasonable doubt that termination would not be in the child's best interests. J.S. had been adjudicated dependent in March of 2019 and had been living with her maternal great-aunt for well over a year. The Department had attempted to reunify J.S. with Father, but Father's incarceration would prevent further efforts to reunite J.S. with him until at least July 2021. J.S.'s maternal great-aunt, on the other hand, has provided for all of J.S.'s needs since she left the hospital and is able to adopt her. The Department's expert testified that termination and adoption would provide J.S. with lasting permanency. Furthermore, adoption by J.S.'s great-aunt was the least restrictive alternative because she was an extended family member—satisfying the Pascua Yaqui's policy to keep tribal children

within the family—and would provide J.S. with a home that maintains her ties to the Tribe's cultures and traditions.

**¶16** Father nonetheless argues that the court erred in finding that J.S. would suffer serious trauma if he or Mother tried to regain custody of her. We reject this argument because it asks this court to reweigh conflicting evidence and to redetermine the credibility of witnesses, which we will not do. *See Alma S.*, 245 Ariz. at 151–52, ¶¶ 18–19.

**¶17** Father also argues that the court contravened ICWA by not honoring the Tribe's preference for guardianship and by applying a beyond a reasonable doubt standard to the Tribe's guardianship petition. These arguments are unavailing. The Arizona Supreme Court recognized in *Valerie M. v. Arizona Dep't of Econ. Sec.* that ICWA allows state legislatures to "specify the standard of proof for state-law findings distinct from the findings required by ICWA," and Arizona's Legislature has established the standard of proof as beyond a reasonable doubt, 219 Ariz. 331, 335 ¶¶ 18–19 (2009); *see also Jennifer B. v. Ariz. Dep't of Econ. Sec.*, 189 Ariz. 553, 555–56 (App. 1997) (finding the purpose of the guardianship statute was primarily to provide "'permanency in the custodial relationship' of 'older children who are not suitable candidates for adoption'" (*quoting* Ariz. House of Rep., H.B.2062, Minutes of the Judiciary Committee, Feb. 3, 1994, at 2.)).

## CONCLUSION

**¶18** For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA